## STATE OF MARYLAND *v.* GUS MERCHANT

[App. No. 81, September Term, 1970.]

*Decided December 28, 1970.*

Before MURPHY, C.J., and ANDERSON, MORTON, ORTH, THOMPSON, MOYLAN, and POWERS, JJ.

*Francis B. Burch, Attorney General,* and *Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* for applicant.

*Richard D. Stack* for respondent.

PER CURIAM.

The application for leave to appeal is denied for the reasons set forth in the thorough and excellent opinion of Judge E. Mackall Childs in the Circuit Court for Anne Arundel County, dated May 12, 1970.

*Application denied.*

### MEMORANDUM OF OPINION

The petitioner, Gus Merchant, an inmate of the Maryland Penitentiary serving a commuted sentence of death for rape, seeks relief under the Uniform Post Conviction Procedure Act, Article 27, Section 645A, *et seq.* of the Maryland Code. A hearing on this, the petitioner's first post conviction petition, was held on April 1, 1970.

On October 9, 1957, the petitioner, a negro laborer, was tried before Judges Benjamin Michaelson and Matthew Evans, sitting without a jury, and found guilty of the rape of a white Glen Burnie housewife. One week later he was sentenced to death by the administration of lethal gas. Following an unsuccessful appeal, *Merchant v. State*, 217 Md. 61, Governor McKeldin commuted the petitioner's sentence to life imprisonment.

At his trial, the petitioner was represented by court appointed counsel, Noah A. Hillman, Esquire, an experienced and respected member of the bar, who was assisted by a younger associate, John A. Blondell, Esquire, who made investigations and represented the petitioner at the sentencing. The petitioner's defense asserted by counsel throughout the trial consisted primarily of an attack on the voluntariness of the "confession" given by Merchant to the police. The petitioner was thoroughly advised of his right to testify or remain silent at his trial and did not testify in his own behalf even though he had persistently maintained in his statement and to his attorneys at all times prior to his conviction, that the victim had consented to the intercourse. No attempt was made by counsel to develop this defense or to conduct any investigation into the reputation of the prosecutrix. On the appeal after conviction Merchant's counsel again raised the issues of the voluntariness of the confession, the insufficiency of the evidence, and the excessiveness of the penalty.

In this petition, the petitioner makes the following allegations:

1. That he was denied due process of law.
2. That the "confession" was involuntary.

3. That the court failed to scrutinize the evidence.
4. That the defendant was denied the right to testify in his behalf.
5. That evidence was suppressed.
6. That adverse publicity prejudiced his trial.
7. That the petitioner was denied his constitutional right to have genuine and effective representation by counsel for his defense in that the petitioner's court appointed attorneys who, as a result of prejudging the petitioner's guilt, failed to pursue the defense of consent or make an appropriate investigation into the reputation of the prosecutrix.

The petitioner's present court-appointed attorney waived final argument on all contentions save the allegation as to incompetency of counsel. However, this court in event of appeal must make a finding on each ground asserted. Rule BK45b; *Farrell v. Warden,* 241 Md. 46.

## I

## DENIAL OF DUE PROCESS

The bare allegation of denial of due process is not sufficient to sustain post conviction relief. *Austin v. Director,* 237 Md. 314; *Briscoe v. Warden,* 3 Md. App. 182.

## II

## THE "CONFESSION"

This allegation that the confession was involuntary was finally determined by the Court of Appeals in petitioner's appeal, *Merchant v. State, supra,* and may not be relitigated in post conviction proceedings. *Meadows v. Warden,* 243 Md. 710.

## III

## FAILURE OF COURT TO SCRUTINIZE THE EVIDENCE

Sufficiency of the evidence may not be reviewed in a post conviction case. *Austin v. Director, supra; Johnson v. Director,* 243 Md. 708.

## IV
### DENIAL OF RIGHT TO TESTIFY

The court finds that after the State had rested its case, counsel and petitioner engaged in a lengthy discussion as to whether or not Merchant would testify in his own behalf and the decision not to testify was that of Merchant.

## V
### SUPPRESSION OF EVIDENCE

See explanation for rejecting first contention.

## VI
### PREJUDICIAL PUBLICITY

The court found no evidence of unduly prejudicial pretrial publicity. The only reference of talk of lynching was contained in Judge Michaelson's dissertation prior to sentencing. Moreover, this was a court trial and there was no showing whatsoever that the two judges hearing the case had been influenced by any pretrial publicity.

## VI
### DENIAL OF EFFECTIVE REPRESENTATION

It is well-established that in a post conviction hearing a petitioner is not precluded from raising the issue of incompetency of counsel because he failed to raise the issue at trial or pursue it on appeal. *Sample v. Warden,* 6 Md. App. 103, 107; *O'Connor v. Warden,* 6 Md. App. 590, 594. Therefore, this petitioner is entitled to have this allegation considered.

The test for determining incompetency of counsel for purposes of habeas corpus and post conviction review which obtained at the time of the petitioner's original trial appears to have been whether there existed at the trial (1) bad faith, (2) fraud, (3) collusion with the State on the part of defense counsel, or (4) such incompetency as would make the trial a farce. *Slater v. Warden,* 241 Md. 668. More recently, the test has been whether under all the circumstances of the particular case the pe-

titioner was afforded genuine and effective representation. *Hyde v. Warden,* 235 Md. 641. *Slater, supra,* also appears to hold that a post conviction petitioner is entitled to have applied the test which obtains at the time of his post conviction petition and not the test which obtained at the time of his trial.

Mere errors in trial tactics are not sufficient to constitute incompetency of counsel. *Hall v. Warden,* 224 Md. 662, 665; *Gullion v. Warden,* 3 Md. App. 263, 265; *Henry v. Mississippi,* 379 U. S. 443, 13 L.Ed.2d 408. Furthermore, failure to raise an available defense at trial does not, in itself, constitute incompetency of counsel. Annotation at 74 A.L.R.2d 1390, 1449.

The prosecuting witness testified that on the morning of July 25, 1957 she had prepared her husband's breakfast and he had left for work at 5:30 A.M. She shut the door and locked it, cleaned the table, straightened the kitchen, and looked at her sleeping children, ten and twelve years of age. She then stated she went back to bed and was asleep when the defendant jumped on top of her in bed, threatened her with a knife, and demanded sexual intercourse. She related several involved conversations with the intruder who is alleged to have had a knife in his hand. After having relations with her, he is alleged to have demanded five dollars for bus fare. She gave him eleven dollars and continued to converse with him while fixing herself a cup of coffee.

After his departure she fixed breakfast for her two boys, cleansed herself, dressed, made the bed, and went next door to her sister's home where she reported she had been raped.

Meanwhile, the petitioner, only a short distance from the prosecutrix's home, engaged in conversation with Mr. and Mrs. Jesse Quarles and paid Quarles $1.90 for a previous loan and transportation to work. He then went to a nearby liquor store and bought a small bottle of wine. From thence he went to the home of his mother-in-law where he paid her $8.00. It was there later in the same day that the police found him hiding in a clothes closet.

That evening after several hours of intermittent questioning, Merchant asked the interrogating officer if it would be easier on him if he told the truth. The policeman responded that he would make no promises,—"but the truth hurts no one." Thereupon, Merchant proceeded to give a statement which was exculpatory in nature wherein he admitted having intercourse with the prosecuting witness, but stated it was voluntary on her part. See *Merchant v. State, supra,* pages 68-69.

Messrs. Hillman and Blondell entered their appearances for the petitioner on October 5th, 1957. While Merchant at the hearing complained that counsel did not visit him often enough, he did state that he saw them twice before the arraignment on September 24th. He stated that he wanted a jury trial, but Mr. Blondell decided on a court trial and that Mr. Hillman suggested he plead guilty and throw himself on the mercy of the court.

The court is of the opinion, and so finds, that defense counsel were conscientious, attentive, and thorough insofar as *their* theory of the case was concerned. The court believes Mr. Blondell in his statement that he visited Merchant at least twelve times before the trial, and personally checked the stories of all persons whose names were given him by his client to determine whether or not they would be helpful in his case as witnesses. Mr. Blondell has, since this case, had extensive criminal law practice both in a prosecutorial and defense capacity and testified that in reviewing the procedure in the case he would not in the light of his experience, since acquired, try the case in a different manner. Mr. Hillman's established reputation as an experienced and ethical practitioner needs no embellishment from this court.

However, the following colloquy took place during Mr. Hillman's testimony:

*Mr. Hillman:*
*On Direct Examination by Mr. Weathersbee* (State's Attorney)
Q. In regard to the confession, what if any-

thing, did the defendant Merchant before trial on the conferences of the third, seventh, and eighth say to you?

A. I recollect this. I believe that at some point he told us that intercourse was voluntary. *Which I didn't believe.* (Italics by the Court) And on two occasions, either the first visit and the last, or the second and the last, he was told in no uncertain terms that *he would have to come up with some sort of an alibi that sounded better than that,* that this woman consented to have intercourse with him, in her home, in her bed. He was told that!

Q. By whom?

A. By me. I don't know whether Mr. Blondell told him anything, but I did.

Q. Why did you say that?

A. Because it didn't make sense. Here was a married woman, of a different race, in her own home, in bed, in the early morning, and he wanted us to believe, and have a court or a jury believe, that he came into that home and had intercourse with her voluntarily. *We didn't believe it, or I didn't.* I don't know what Mr. Blondell believed, *but I didn't.* And I believed that he would have had to have an alibi or a stronger defense than to say that she had intercourse with him voluntarily.

*On Cross Examination by Mr. Stack*

Q. Did you feel that you were adequately prepared for the case, sir?

A. I didn't think the case was complicated. I thought it was a simple case.

Q. You mean because you believed the man to be guilty?

A. No, not that.

Q. Well, you stated that you did not believe his story.

A. *We didn't; we couldn't—I could not accept the story* that he went into this home and had intercourse with this woman of a different race and that she voluntarily consented. It didn't set right; there had to be something else to it, that's what I mean. And so he was importuned to give us another — at first, if I recollect, he denied it—then came around to the idea that she agreed.

Q. Was a background investigation made of Mrs.—?

A. No, I didn't; whether Mr. Blondell did, I don't know.

Q. Did you at any time attempt to ascertain whether or not Mrs.—volunteered to have intercourse with Gus Merchant?

A. No.

*On Examination by the Court*

Q. Mr. Hillman, were you aware that your client had given a statement prior to the trial, to the police?

A. Yes.

Q. And were you able to ascertain what the statement contained?

A. No. I don't recollect that we did — may be Mr. Blondell has this recollection, because he has notes I'm sure because he made certain independent—.

Q. Did you try to ascertain from the defendant himself what he told the police?

A. Oh, yes.

Q. And do you recall just what he had told the police as far as he related it to you?

A. I'd have to stretch my imagination widely to recall now what he told me, except that I can say that as to this, as I told Your Honor, that the story that he told us, I'm sure that on two occasions I told him a couple of times to come up with a better story than that.

*Mr. Blondell*:

*On Direct Examination by Mr. Weathersbee*

Q. Do you recall prior to trial having observed the statement that Mr. Merchant gave to the police?

A. Prior to trial, yes.

Q. How did you obtain that?

A. From the State's Attorney's office, and I could be wrong, but I am sure that we went over that statement with Gus prior to trial. I am practically sure of it, because we had a very heart-to-heart talk over the statement that he gave, *and he stuck to it.*

*On Cross-Examination by Mr. Stack*

Q. At any time, in your recollection, did Gus Merchant deviate from his statement that he had not raped that woman?

A. Did he ever deviate?

Q. Did he ever profess. . .

A. *His story from the very beginning to the end was that it was by consent, from the very beginning.*

Q. As stated in the statement he gave to the police?

A. That's right, he stuck with that statement from the beginning to the end.

Q. Did you spend any time in investigation attempting to verify that statement?

A. No, I didn't attempt to talk to the victim.

Q. Did you talk with the victim's sister?

A. No.

Q. Did you talk with the victim's husband?

A. Oh, no.

Q. You did nothing to check out this statement, check it out to see if it were true?

A. *Gus Merchant insisted that it was true.*

Q. Did you do anything to verify or to confirm in your own mind whether or not this statement was true?

A. Well, other than to check up on where he was and what these other people or at least talk to them, no, I didn't do anything else to verify as to what he said.

"The criminal statute of this state, although fixing the penalties, does not define the crime of rape. See Code (1957) Art. 27, § 461. However, the law writers generally define common law rape as the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim. Hochheimer, *Criminal Law*, § 47 (1911); 1 Wharton, *Criminal Law and Procedure*, § 300 (1957); 44 Am. Jur., *Rape*, § 2; 75 C.J.S., *Rape*, § 1.

"Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety. But no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances. As in this case force may exist without violence. If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim—having regard to the circumstances in which she was placed—a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent to force. *State v. Thompson*, 227 N. C. 19, 40 S.E.2d 620 (1946). See also *State v. Dill*, 3 Terry 533, 40 A. 2d 443 (Del. 1944); 75 C.J.S., *Rape*, § 12b; 44 Am. Jur., *Rape*, § 5. Cf. *Selvage v. State*, 148 Neb. 409, 27 N.W.2d 636 (1947).

"With respect to the presence or absence of the element of consent, it is true, of course, that

> however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character. There is, however, a wide difference between consent and a submission to the act. Consent may involve submission, but submission does not necessarily imply consent. Furthermore, submission to a compelling force, or as a result of being put in fear, is not consent." *Hazel v. State,* 221 Md. 464.

It will be noted that Merchant made his admission prior to consulting with counsel (eleven years prior to *Miranda v. Arizona,* 384 U. S. 436) and although he consistently maintained that there was consent, it was never brought before the court for consideration even after the admission was introduced into evidence at the trial. Of course, no one can now hazard a supposition as to what effect this defense may have had upon the court, nevertheless, the following facts do warrant consideration:

1. PROSECUTRIX'S BEHAVIOR FOLLOWING THE CRIME: The woman did not call the police or her husband immediately after the crime, but instead, cooked the children's breakfast, changed the bed sheets, and put them in the clothes hamper; took off her nightgown and put it in her bureau drawer, changed her clothes, and washed herself before going over to her sister's to report the rape.

2. THE DEFENDANT'S BEHAVIOR FOLLOWING THE CRIME: After leaving the prosecutrix's house, the defendant did not behave as if he felt in any danger of being apprehended for the commission of a crime: he stopped and talked with the Quarles near the victim's house and these persons noticed nothing unusual about his behavior; he distributed the money received from the woman to persons living in the immediate neighborhood immediately after the crime; and he failed to flee or secret himself until the police surrounded his house.

3. THE KNIFE: The fact that the police found a common kitchen knife, in the defendant's china closet does

not in itself significantly inculpate the defendant. The alleged victim claimed the knife was hers, the defendant that it was his. He admitted that he had it in the bedroom.

4. SIGNS OF VIOLENCE: There were no signs of a struggle or of torn clothes. Although the prosecutrix stated that the rapist was "rough" and that he "hurt" her, the doctor reported his examination was "absolutely negative" (T-11) as to evidences of violence or of rape.

5. OUTCRIES: The woman's protestations, which she characterized as "kind of loud," failed to awake her children asleep in the next room.

6. DEFENDANT'S BACKGROUND: The court may have pondered the probability that the defendant, a married man with two children, with no prior criminal record or record of mental instability, and with an honorable discharge from the army, would risk conviction of a capital crime by selecting a victim who could easily identify him since they had spoken to one another over the backyard fence on at least two occasions (T-89, 90) as he passed by her house on his way to work.

7. EXCULPATORY STATEMENT TO POLICE: The defendant, described as being of below-normal intelligence and with only an 11th grade education, although he had been in custody for twelve hours and by the State's own admission subjected to at least six and one-half hours of interrogation without benefit of counsel, gave to the police a statement in which he maintained, as he continued to maintain until and after his conviction, that he had had intercourse with the prosecutrix with her consent.

8. MONEY GIVEN DEFENDANT: The prosecutrix's behavior is somewhat questionable when she gave the defendant more money than she stated he had demanded.

9. PROSECUTRIX'S TESTIMONY: The woman testified that the rapist's face was at all times during the crime and prior to his departure covered by a pillow slip (T-82, T-X-23) which she three times described as cover-

ing his face from the nose up (T-46, T-X-11, T-X-22), and once from the nose down (T-24) ; and yet, after the rape, while she sat at the kitchen table and drank a cup of coffee, the defendant "kept staring at me all the whole time, standing by the door" (T-58).

10. DEFENDANT'S SPEECH IMPEDIMENT: The prosecutrix failed to mention, during the rather extensive conversations which she testified took place between her and the rapist, that the defendant had a very pronounced speech impediment.

11. MEANS OF ENTRY: The victim testified that she closed and locked the door, yet no testimony was offered as to any breaking and entering on the part of the accused. His access to the house was completely unaccounted for.

It would seem to the undersigned that presented with the above-listed facts and circumstances, a court might properly have entertained the probability that the accused may have been telling the truth when he stated that the prosecutrix had consented to the intercourse, even though an investigation into the prosecutrix's background may have revealed nothing which would have contributed to the defense.

Would the fact that defendant's counsel refused to believe his story and thereby failed to present it to the court deprive the petitioner of effective representation in a constitutional sense?

The American Bar Association, Canons of Professional Ethics, Canon 5, defines the duty of counsel for a criminal defendant:

> "It is the right of the lawyer to undertake the defense of a person accused of a crime, *regardless of his personal opinion as to the guilt* of the accused; otherwise innocent persons, victims of suspicious circumstances, might be denied proper defense. Having undertaken such defense, the lawyer is bound by all fair and honorable means, to present every defense that the law of the land

permits, to the end that no person may be deprived of life, liberty, but by due process of law."

That the representation of a defendant charged with rape properly includes an investigation of the reputation of the prosecutrix has long been recognized by the courts. In *Powell v. Alabama,* 287 U. S. 45, 77 L. Ed. 158 (1932), where the Supreme Court reversed the state trial court's conviction of the "Scotsboro Boys" because of the denial of the right to counsel in a rape case where the court proceeded to try the defendants six days after indictment without allowing counsel adequate time for preparation, the court said (page 165 of 77 L. Ed.) :

"It is not enough that counsel thus precipitated into the case thought there was no defense and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate."

In *Smallwood v. Warden,* 205 F. Supp. 325 (1962) the Fourth Circuit District Court reversed the May 1957 rape conviction of a St. Mary's County (Maryland) defendant who had told his counsel that the victim had consented and that there was a witness, a taxicab driver, who could testify as to the victim's promiscuity. His counsel failed to pursue the defense of consent or make any investigations into the reputation of the prosecutrix. The court held that these facts indicated representation of such low caliber as to amount to no representation. Thus, the guarantee of due process had been violated. The court based its holding on the fact that the defendant's court-appointed attorney (at page 329) :

"did not believe what his client told him and took no steps to check the story or develop the available defense."

Similarly, in *Coles v. Peyton*, 389 F. 2d 224 (1968), the Fourth Circuit Court of Appeals reversed a Virginia rape conviction where the defendant's court-appointed attorney failed to develop the defense of consent or investigate the reputation of the prosecutrix after the defendant had told his attorney that he was under the impression that he was having intercourse with a common prostitute. That court set forth the principles which should guide a court-appointed attorney in his representation of an indigent defendant (page 226):

> "The principles may be simply stated: Counsel for an indigent defendant . . . must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable. Counsel must conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial. An omission or failure to abide by these requirements constitutes a denial of effective representation of counsel unless the state, on which is cast the burden of proof once a violation of these precepts is shown, can establish lack of prejudice thereby."

*Johns v. Smyth*, 176 F. Supp. 949 (D. C., 1959) a habeas corpus proceeding reviewing a 1942 first degree murder conviction by a Virginia State Court makes a distinction between mere errors in trial tactics and behavior by an attorney amounting to ineffective representation. In that case the defendant and the victim were inmates in a Virginia penitentiary. Johns maintained that he killed the victim after the victim had suggested an unnatural sex act. The State's evidence pointed to other motives. The court gave instructions only as to first and second degree murder, despite the possibility of a manslaughter verdict. The defendant's court-appointed attor-

ney failed to submit instructions covering manslaughter and failed to argue the case to the jury. The attorney explained his failure to pursue the alleged suggestion by the victim in mitigation of the homicide because he — "could not conscientiously argue to the jury that (the defendant) should be acquitted" (page 953). The District Court, in reversing, held that the trial had the earmarks of an *ex parte* proceeding and that the defendant's attorney was so prejudiced and convinced of his client's guilt that he was unable to give his client his undivided allegiance and faithful service. The court stated that while the attorney's actions could be, and ordinarily would be, interpreted as trial tactics, his own admission that his behavior was motivated by his conscience which would not permit him to adopt certain customary trial procedures, caused his actions to enter the field of incompetency and thus the defendant was denied due process of law.

"It sustains rather than derogates against our profession if counsel presents the contentions of his client as such, even though he does not personally underwrite them as his own. It may not be according an indigent defendant his right to counsel or the equal protection of the laws to tell counsel generally as we do in the Canons of Professional Ethics, that it is improper to express in argument a personal opinion concerning a defendant's guilt or innocence, and yet to expect counsel to deny his client access to the independent judgment of the court by reason of counsel's own expressed belief that his client's contention does not possess sufficient merit to justify hearing." *Gallegos v. Turner,* 256 F. Supp. 670, 676-677 footnote 6.

"A lawyer's job is to represent and defend his client in spite of his own feeling with respect to his client's guilt or innocence,—otherwise and simultaneously, he would don the robe of judge and claim membership on the jury, whereas he

is but liason between.—There have been many honest strategems less plausible than that employed here that seemed idiotic at the time to a bystander, but which resulted in arrival at the truth and the acquittal of an innocent." *State v. Dennis*, 385 P. 2d 152.

The undersigned finds that the petitioner's counsel in prejudging their client's guilt failed as a consequence to pursue the defense of consent or to make an investigation into the reputation of the prosecutrix and that their belief in the improbability, if not the impossibility, of a white housewife consenting to intercourse with a negro laborer in her own home while her children slept in the adjoining room is the equivalent of the attorney's "conscience" in *Johns* and thus removes the petitioner's counsel's conduct of the defense from the realm of trial tactics and places it in the category of ineffective representation in a constitutional sense. Counsel appear to have fallen into the trap of confusing their duty to defend an accused with their duty to advise a defendant in a civil action and thereby allowed their sense of probability of success to blind them to the possibilty of acquittal.

Significantly, the trial court, prior to pronouncing its sentence of death by the administration of lethal gas stated, *inter alia,* the following reasons for the sentence which it had decided to impose:

". . . .Nowhere has (the Court) been able to find anything that is sometimes prevalent in some other cases of similar nature, and that is, something which would *mitigate the gravity of the offense to the extent that there was no invitation, or some contact, or some set of circumstances which minimize the effect of an act of this kind. . .Sometimes in some of these cases, the woman may by her conduct indicate to a man that there may be an approach.* This is a different case. . .The evidence against him was analyzed and analyzed to the best interest of all

concerned. Had there been any doubt, irrespective of the effect of the act in this case, any reasonable doubt, he would have been given the benefit of it."

It seems not improbable that had the petitioner's counsel asserted at the trial and at the sentencing, the petitioner's insistence on the victim's consent, the facts and circumstances listed above could have supported this defense in the minds of the triers of fact. The sentencing judges in view of the reasons given for imposing the death penalty, may have pronounced a much milder sentence or made an acquittal.

### ORDER

The court having found that the petitioner in his original trial was denied his constitutional right to effective representation of counsel, it is ORDERED this 12th day of May, 1970, by the Circuit Court for Anne Arundel County that the State's Attorney for said County within thirty days from date hereof either note an appeal to the Court of Special Appeals from the finding of this court or indicate his intention to retry the petitioner. In the event of either action on the part of the State's Attorney for Anne Arundel County, petitioner will be given leave to apply for his release on bail pending the outcome. However, should the State's Attorney fail to take either course of action within thirty days, the petitioner shall thereupon be released.

......................................

E. Mackall Childs, JUDGE