JOHN FRANCIS BRISCOE *v.* STATE OF MARYLAND

[No. 1207, September Term, 1977.]

*Decided July 14, 1978.*

---

11. We see no need to discuss the other issues raised by the appellant.

The cause was argued before MORTON, DAVIDSON and MACDANIEL, JJ.

*Charles Duvall Smith,* with whom were *Taylor, Smith & Parker* on the brief, for appellant.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, W. Timothy Finan, Assistant Attorney General,* and *Robert C. Nalley, State's Attorney for Charles County,* on the brief, for appellee.

MacDaniel, J., delivered the opinion of the Court.

Appellant, John Francis Briscoe, was tried by a jury in the Circuit Court for Charles County under an indictment charging him with two counts of rape, one count each of false imprisonment, larceny and other related offenses. On January 22, 1976, he was convicted of two counts of rape as well as false imprisonment and petit larceny. On November 9, 1976, this Court filed a per curiam opinion, reversing the judgment of the Circuit Court for Charles County and remanding for a new trial. On remand, and after proper motion, the case was removed to the Circuit Court for Prince George's County. On June 29, 1977, a hearing was held in open court on appellant's motion to suppress evidence and the motion was denied. The case came to trial before a jury on October 10, 1977. The jury found appellant guilty on the two counts of rape, guilty of false imprisonment, and not guilty of petit larceny. Appellant was sentenced to life imprisonment for the rape convictions and ten years for the false imprisonment conviction, to run concurrently.

The victim, whom we shall simply call Mary, resided at a boarding house located at 102 Kent Avenue in La Plata, Maryland. Mary arrived home at approximately 11:00 P.M. on May 15, 1975. She fell asleep on the living room couch. Sometime after 1:00 A.M. on May 16, 1975, she awakened and found a man standing near the couch. After asking for money and receiving none, this man pointed a sawed off shotgun at her and ordered her into the kitchen. While in the kitchen, Mary was tied with articles of clothing and a gag was placed across her mouth. She was taken to a downstairs bedroom and told to lie on the bed. She testified "he laid on top of me and raped me." According to the victim, this man then left the bedroom and went upstairs. He returned to the bedroom and "he raped me again." When Mary was asked whether there was penetration on each occasion, she answered "yes." She described her assailant to the police and stated that he wore a striped sweater, dark pants, a white mask, and wore a ring on his left hand. Taken at this time from the residence was Mary's hospital pay check, a ten dollar bill with writing on

it, and fifty silver dollars. The assailant had on soft soled shoes with a lot of mud on them.

Dr. Schultz examined Mary later that morning and testified he found the presence of motile sperm and that she had sexual intercourse within the last twenty-four hours.

Evidence was introduced by the State to show that the bedroom where the alleged rapes took place was used at times by Theresa Chase, the appellant's sister-in-law, who worked at the boarding house, and that appellant had worked for the past several weeks at the boarding house, during the course of which he had occasion to be on the premises and in the building of the boarding house.

Deputy Brown arrived at the scene of the alleged rape about an hour later with a Police bloodhound named "Lady." After Lady was exposed to a scent, she followed a course through a muddy area winding up at a parking lot at a small shopping area about three-tenths of a mile from the scene of the alleged rape. It was at this point that Lady lost the scent completely.

Officer Nolan H. Woodland arrived at the scene of the alleged rape at approximately 3:00 a.m. Approximately five minutes later he went to the area at the shopping center where Lady had lost the scent. Officer Woodland, sometime between 1:30 and 2:30 A.M. the same day, had observed an automobile he knew to belong to Joseph Chase parked at the same spot where Lady had stopped. It was the only car parked there at that time. Woodland had actually gone over and looked into the car to make sure that there was nothing awry when he first saw the car. Later on he passed that area again and the same car was still parked there. When Woodland returned to that area after information of the alleged rape, this car had been moved.

Testimony from Gladys Briscoe, wife of appellant, Mary T. Chase, sister-in-law of appellant, and Joseph Chase, brother-in-law of appellant, revealed that appellant had in fact used the Chase car in the early morning hours that the alleged rape took place. At approximately 6:30 A.M. on this same morning the automobile owned by Joseph Chase was parked beside Joseph Chase's trailer. The other trailer located right

near Joseph Chase's trailer was occupied by the appellant, John Briscoe.

An application for a search and seizure warrant was filed around 9:45 A.M. on May 16, 1975, with an affidavit in support thereof. A search and seizure warrant was issued and executed the same morning. The police searched the Chase automobile, the Chase trailer, and the appellant's trailer. Certain evidence, which included the stock of a shotgun found between a mattress and spring, was seized from appellant's trailer and introduced into evidence.

Four issues are presented in this appeal: (1) Was there probable cause in the affidavit for the issuance of a search and seizure warrant? (2) Did the testimony of the complaining witness establish that a rape took place? (3) Did the trial court properly admit testimony concerning the following of a trail by a police bloodhound? (4) Did the trial court err in not granting the missing witness instruction requested by the appellant?

## I.

The appellant initially challenges the sufficiency of the affidavit used to establish probable cause for obtaining the search warrant. The affidavit, executed by Investigator Carl R. Steinhauser of the Charles County Sheriff's Department, stated, *inter alia,* the following:

"2. At 2:38 a.m. on May 16, 1975, [Mary] (w/f; DOB: 5-11-54) reported to the Charles County Sheriff's Department that at approximately 2:00 a.m. on said date a black male aged 25-30 approx. 5' 7", 160 lbs. wearing a striped sweater & dark pants with a white mask and a ring on his left hand entered her residence at 'Dr. Monteiro's Boarding Home', 102 Kent Ave., La Plata, Charles County, Maryland, awakened her and pointed a shotgun at her. She stated that he forced her into the kitchen at gunpoint and tied her hands behind her back and took her into a bedroom, placed her on a bed and raped her. She said that he then went to upper

floors of the residence, broke into two rooms and removed therefrom her employee paycheck from Physicians' Memorial Hospital, La Plata, Md., a ten dollar bill with writing on it and 50 silver dollars. She said that he then returned to the room where she remained tied on the bed and raped her again, whereupon he left through the back door through which he had entered.

3. Officer Gale Willett of the Charles County Sheriff's Department and I ([initialed] C.R.S.) received Miss [Mary] report and responded to 102 Kent Avenue, whereupon we ([initialed] C.R.S.) *requested assistance of the Department's Mobile Crime Laboratory and bloodhound,* Officer William D. Brown of the Department has advised me today that he responded with the bloodhound and that the bloodhound was exposed to the scent of a striped sweater matching the description provided by Miss [Mary] which had been recovered from the area of the rear of the residence. Officer Brown reported that the bloodhound thereupon followed a course leading generally eastward from the rear door of the residence, through a muddy area and a housing development, around in a southwesterly direction toward Charles Street in La Plata to a parking area off of Kent Avenue behind the County Drug Store, which is approximately 3 doors south of Miss [Mary's] residence on Kent Avenue and within sight of it. Officer John Wood of the Crime Laboratory advised that he responded to the residence and discerned within it mud on the floor which was compatible in appearance to that observed in the area through which Officer Brown and the bloodhound had walked.

4. Officer Nolan H. Woodland of the La Plata Town Police advised me today that as early as 1:30 a.m. and as late as 2:30 a.m. this date he observed a 1965 Mercury Comet 2-dr sedan, light bluish-green

in color with primer paint on both rear quarter panels bearing Md. reg. ARH-185 parked behind the referenced County Drug Store in the area at which the bloodhound's foray ended. A check with the Maryland Motor Vehicle Administration has revealed such a vehicle to be registered to Joseph Edmond Chase of Rt 225 General Delivery, La Plata, Md. Officer Woodland has advised that he is personally acquainted with said Chase and knows him to occupy an older dark green house trailer on Dump Rd., La Plata, .3 mi from that road's intersection with Md. Rt. 225; Officer Woodland further indicated that he knows the green and silver trailer immediately to the north of the Chase trailer to be occupied by John Francis Briscoe. At 6:30 a.m. today I personally observed the referenced vehicle parked in front of the trailer said to be occupied by Chase; I directed that surveillance of the trailers and cars be maintained and at 7:30 a.m. was advised by Officer W.S. Hutchinson that the surveillance team had stopped the vehicle as it emerged from Dump Rd. and found it to be occupied by Joseph E. Chase.

5. Arturo Monteiro, M.D. advised me this date that at approximately 3:00 a.m. a Mary T. Chase entered Physicians' Memorial Hospital at La Plata in the company of Gladys Chase, a/k/a Gladys Briscoe. Dr. Monteiro indicated that he had inquired of Gladys Briscoe as to the whereabouts of her husband, John Francis Briscoe, during the course of the morning and that she stated that she and he had attended a dance at Pomonkey at the conclusion of which John Francis Briscoe had left in the company of 'Joe'; Dr. Monteiro further said that Mrs. Briscoe told him that John Francis Briscoe had arrived home in the vicinity of 2:30 a.m. Dr. Monteiro further advised that he is the proprietor of the Boarding House at 102 Kent Avenue and that the referenced John Francis

Briscoe has been employed by him for the past several weeks during the course of which Briscoe had occasion to be on the premises of and within the building of the Boarding House.

6. That at 7:45 a.m. today, during the course of preparation of this Affidavit Joseph E. Chase appeared at my office and advised that he is the owner of the referenced Mercury automobile and that, while he had attended no dance during the course of the evening, John Francis Briscoe, his neighbor, had requested permission to use the car and that he, Chase had given Briscoe the keys to it. Mr. Chase told me that he assumes Briscoe did in fact use the car inasmuch as he noticed that when he approached it this morning it appeared to have been moved from the location in which he had parked it. Mr. Chase denied having accompanied Briscoe to a dance during the course of the evening.

7. WHEREUPON your affiant believes that there is reason to expect that the referenced automobile and trailers contain material of an evidentiary value in the investigation of this case, particularly items of clothing, the reportedly stolen paycheck and silver dollars, as well as mud droppings suitable for comparison with those found at the crime scene." (Emphasis added.)

On the basis of the above facts, the judge concluded that there was probable cause to search Joseph Chase's car and residence and the residence of the appellant.

The appellant argues that the use of the bloodhound to detect the trail of a perpetrator of a crime is equivalent to the use of an informer, and that the use of the affidavit is totally defective for the reason that it fails to specify the facts upon which the affiant concluded that the information from the dog was reliable.

An affidavit in support of an application for a search warrant may be based on hearsay so long as there is a

substantial basis for crediting the hearsay. *Rugendorf v. U. S.,* 376 U. S. 528, 84 S. Ct. 825, 11 L.Ed.2d 887 (1964).

The judge must be informed (1) of the underlying facts upon which the informer has based his conclusion, and (2) the circumstances from which the affiant has concluded that the informant was credible or his information reliable. *Spinelli v. U.S.,* 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964).

The difficulty in the present case is not with the first prong of the above test but with the second prong, the "veracity" prong. The veracity prong, as pointed out in *Thompson v. State,* 16 Md. App. 560, 298 A. 2d 458 (1973) is "significantly phrased in the disjunctive." The two questions therefore are whether the affidavit sufficiently spelled out the bloodhound's "credibility" or if not, "Was the information furnished under circumstances giving reasonable assurances of trustworthiness?" 16 Md. App. at 566, 298 A. 2d at 461.

The appellant would have us rule that the same strict standards which apply to unnamed police informants also apply to police tracking dogs. This same proposition was rejected in the case of *United States v. Meyer,* 536 F. 2d 963 (1st Cir. 1976). In *Meyer* a police dog's positive reaction to certain camera boxes and bag belonging to the defendant was used to establish probable cause in obtaining a warrant to search for drugs. The defendant contended that the affidavit supporting the warrant was defective because it merely described the dog as "trained." The Court, in rejecting the contention that information received from a police canine must meet the same rigid standards as information from an unidentified police informant, stated:

> "The same concerns that would be present in a human informant are simply not relevant here. *Cf. United States v. Pond,* 382 F. Supp. 556 (S.D. N.Y. 1974). An acute sense of smell is characteristic of canines, but out of the ordinary in humans. Moreover, a canine, when trained, reacts mechanically to certain cues in his environment." 536 F. 2d at 966.

The Courts of Maryland, while never having dealt specifically with a "canine informant" have recognized certain sources as more reliable than others. In *Dawson v. State,* 14 Md. App. 18, 284 A. 2d 861 (1971), Judge Moylan in his concurring opinion pointed out that:

> ". . . it is implicit in the Supreme Court's treating of *Aguilar-Spinelli* problems that the rules set out for establishing an informant's credibility are aimed primarily at unnamed police 'informers' rather than at that broad class of secondary sources who are the victims of crime, the disinterested witnesses of crime, other disinterested civilian sources of information or other law enforcement officers. The members of this broad class are generally, but not universally, named. They are not from the criminal milieu." (Footnotes omitted.) 14 Md. App. at 33, 284 A. 2d at 869.

To be included in the "broad class of secondary sources" are police tracking dogs, such as the one used in the case at bar.

The affidavit in this case, unlike the one in the *Meyer* case, did not specifically state that the dog was "trained." That fact, however, was implicit in the sentence which stated, "Officer Gale Willett of the Charles County Sheriff's Department . . . requested assistance of the Department's Mobile Crime Laboratory and bloodhound." In determining whether the above description adequately sets forth a basis for reliability, we are guided by *United States v. Ventresca,* 380 U. S. 102, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965), where the Court pointed out that if the constitutional policy of searches pursuant to warrants is to be served, affidavits for search warrants:

> ". . . must be tested and interpreted by magistrates and courts in a common sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper

place in this area." 380 U. S. at 108, 85 S. Ct. at 746, 13 L.Ed.2d at 689.

When the judge reviewed the affidavit under consideration, he could have realistically assumed that the bloodhound procured from the Sheriff's Department was trained and experienced in tracking. To assume otherwise defies common sense.

It is our opinion therefore that the affidavit, considered in its totality, was sufficient to satisfy the second prong of *Aguilar.* Moreover, from all the facts contained in the affidavit including the evidence of the tracking, a judge could reasonably conclude that there was probable cause to search the appellant's residence.

The search warrant authorized the police to search for items of clothing, the stolen paycheck and silver dollars, as well as mud droppings suitable for comparison with those found at the scene of the crime. In the process of searching the dwelling for the above items, one of the officers lifted a mattress and saw a shotgun stock with a long string attached. The stock was seized and later admitted into evidence. The appellant contends that because the shotgun stock was not one of those items particularly described in the affidavit, its seizure was improper and its admission into evidence was erroneous.

We conclude that the seizure of the shotgun stock and its admission into evidence was proper under either of two theories. The affidavit states that a shotgun was used during the commission of the crimes. The search and seizure warrant authorized the police "to seize all evidence and paraphernalia found which may be in connection with purported violations of the aforementioned crimes statutes." Assuming that the police had knowledge that a string had been attached to the butt plate of the shotgun and that a shotgun was used in the commission of the crimes, along with the affidavit stating a shotgun was used, gave the police probable cause to seize the stock of the shotgun with the string attached. In addition, assuming that the police did not have probable cause the seizure of the gun stock was permissible under the *plain view* doctrine as set forth in *Coolidge v. New Hampshire,* 403 U.

S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971). This Court in discussing the plain view exception to the warrant requirement, stated in *Smith v. State,* 33 Md. App. 407, 365 A. 2d 53 (1976):

> "Under the plain view doctrine, a warrantless seizure of incriminating evidence may be permitted when the police are lawfully searching a specified area. For the warrantless seizure to be constitutionally valid under the plain view doctrine, however, it must be established that the police had prior justification for an intrusion into the area searched, that the police inadvertently came across the item seized, and that it was 'immediately apparent' to the police that the item seized was evidence." 33 Md. App. at 410, 365 A. 2d at 55.

In executing the search pursuant to the warrant, it was eminently reasonable for the police to look under a logical hiding place such as the appellant's mattress. When they did so it was immediately apparent that the shotgun stock was evidence. The evidence revealed that the victim told police that her assailant pointed a shotgun at her which had a long string hanging from the end. When the officer saw the stock with the string it was immediately apparent that the stock was the one which may have been used in the crime. The seizure therefore came within the plain view exception and its admission into evidence was proper. Under either of doctrines stated above no error was committed in the seizure of the shotgun stock and its admission into evidence.

## II.

The appellant next contends that the evidence was insufficient to establish that there was force used in the rape; that there was penetration, or that the act was committed by someone other than the complainant's husband.

Force is an essential element of the crime of rape. *State v. Merchant,* 10 Md. App. 545, 271 A. 2d 752 (1970). In this case there was more than sufficient evidence that force was used.

The assailant broke into the victim's home, pointed a shotgun at her and tied her up. Such action would reasonably create in the mind of the victim an apprehension of serious harm, sufficient to overcome her will to resist. Such acts establish force. *State v. Merchant, supra.*

As to the issue of penetration, the victim testified on two occasions that there was penetration. In addition, the examining physician testified there was motile sperm present in the victim. This evidence was more than sufficient to sustain the conviction. *McEntire v. State,* 2 Md. App. 449, 235 A. 2d 311 (1967).

The appellant, relying on *Mullaney v. Wilbur,* 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1974), contends there was no testimony that the victim was not the wife of the appellant and that the State therefore failed to prove all the necessary elements of the crime. The Court of Appeals has defined rape as "the act of a man having unlawful carnal knowledge of a female . . . by force without the consent and against the will of the victim." *Hazel v. State,* 221 Md. 464, 468-69, 157 A. 2d 922, 924 (1960). The question of the nonspousal character of the offense is not an element of the crime, but is an affirmative defense which was never raised below. As the issue was never properly generated by the evidence, the State did not have the burden of negating it. *State v. Evans,* 278 Md. 197, 362 A. 2d 629 (1976).

### III.

When the State called William Brown of the Charles County Sheriff's Department, appellant objected to his testifying on the ground that Brown was not a reliable trainer or handler; that the bloodhound he used was not shown to be properly trained or reliable, and that the evidence of the trailings was speculative. The trial court conducted an examination outside the jury's presence and found Brown competent to testify as to the investigation he and the bloodhound undertook.

This Court dealt with the admissibility of trailing by dogs in the case of *Terrell v. State,* 3 Md. App. 340, 239 A. 2d 128 (1968). The Court in *Terrell* ruled that before any evidence

pertaining to the results of a dog's tracking are admitted in evidence, a proper foundation must be laid. The handler must testify as to his own qualifications and experience and that of the dog, along with an account of the dog's ability to track. Next, the circumstances pertaining to the trailing itself must be shown. For example, was the trail fresh, or was there other traffic in the area, or were the dogs interfered with while tracking, or were the dogs placed on the trail at a point where the perpetrators were reasonably assured to have been?

The above requirements were met in this case. The dog's handler, Officer Brown, had over seven years of experience in handling bloodhounds. He had attended seven different training sessions sponsored by the National Police Bloodhound Association. Officer Brown stated he had used dogs fifty times in trying to locate people and had "good success." With the bloodhound used to search for appellant, he had had "three or four successful finds" and had trained the dog over the previous two and a half to three years. The testimony established that the dog was retrained in tracking persons on a monthly basis.

Deputy Brown had arrived at the scene about an hour after the rape. The dog was exposed to mud on the floor left by the assailant and the striped sweater found at the rear of the residence, which matched the description of the one worn by the assailant. The dog was ordered to "find." From the back porch of the residence the dog followed the trail to the parking lot of the drug store, when she lost the scent.

The above evidence fully complies with the guidelines laid down in *Terrell.* The trial court, therefore, did not err in admitting the evidence of the tracking.

Finally, appellant claims that the trial court erred in failing to give the missing witness instruction.

The basis for the request was that a large number of items had been sent to the F.B.I. laboratory by the Charles County Sheriff's Department for analysis. These items included clothes, blankets, towels, sheets, pubic hair, head hair, soil samples, carpet samples, blood samples, and saliva samples. Agent Burwitz, an expert in the identification of hairs and fibers, was called to testify about only a portion of the items

and only in relation to his specialty of hairs and fibers. The appellant contends that the fact that the other items, which also underwent scientific tests, were not testified to was an indication that the results of the tests were favorable to the defendant.

The missing witness rule, as stated in 1 Underhill, *Criminal Evidence,* § 45 (rev. 6th ed. P. Herrick 1973), is:

> "The failure to call a witness raises a presumption of inference that the testimony of such person would be unfavorable to the party failing to call him, but there is no such presumption or inference where the witness is not available, or where his testimony is unimportant or cumulative, or where he is equally available to both sides."

In the case at bar, the missing witness and the test results were as available to the appellant as they were to the State. For this reason the trial judge did not err in refusing to give the missing witness instruction. *Christensen v. State,* 274 Md. 133, 333 A. 2d 45 (1975).

*Judgments affirmed.*
*Appellant to pay the costs.*