GREGORY BERNARD ROBERTS *v.* STATE OF
MARYLAND

[No. 305, September Term, 1982.]

*Decided December 7, 1982.*

The cause was argued before MOORE, LISS and ADKINS, JJ.

*Edward Smith, Jr.,* for appellant.

*Stephen Rosenbaum, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Basil Wadkovsky, State's Attorney for Kent County,* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

On September 3, 1981, Gregory Bernard Roberts, appellant, was convicted by a jury in the Circuit Court of Kent County on charges of first degree rape, unlawfully wearing and carrying a dangerous and deadly weapon openly with the intent or purpose of injuring, daytime housebreaking, and attempting to steal goods of value of less than $300.00. Sentences were imposed on each of the charges and appellant noted this appeal, raising the three following issues:

 I. Whether the trial court abused its discretion in refusing to grant a continuance?

 II. Whether the trial court erred in allowing the State to produce a dog lineup, thereby denying the appellant his right of cross-examination and prejudicing the jury with the use of unreliable testimony?

 III. Whether the trial court erred in refusing to compel the State to turn over certain laboratory reports?

## I.

The Court of Appeals has made it abundantly clear that the granting of a continuance rests within the sound discretion of the trial judge and that such discretion will not be disturbed on appeal absent a showing of abuse prejudicial to the defendant. *See Jackson v. State,* 288 Md. 191, 416 A.2d 278 (1980); *McKenzie v. State,* 236 Md. 597, 204 A.2d 678

(1964); *Taylor v. State,* 226 Md. 561, 174 A.2d 573 (1961). In *Jackson v. State,* 214 Md. 454, 135 A.2d 638 (1957), *cert. denied,* 356 U.S. 940, 78 S.Ct. 784, 2 L.Ed.2d 816 (1958), the Court of Appeals set forth the following criteria to be followed in determining if an abuse had occurred:

> To show such an abuse of discretion and prejudice for failure to continue a case because of the absence of witnesses, the party requesting the continuance should show: that he had a reasonable expectation of securing the evidence of the absent witness or witnesses within some reasonable time; that the evidence was competent and material, and he believed that the case could not be fairly tried without it; and that he had made diligent and proper efforts to secure the evidence. [*Id.* at 459.]

After applying these factors to the circumstances in this case we conclude that the trial judge acted within the bounds of his discretion.

The record discloses that on May 12, 1981 appellant's counsel, pursuant to Maryland Rules 741 and 780, filed a motion for discovery and inspection in which he propounded some 100 questions, some of which included "boiler plate" interrogatories which had no relevance to the charges against the appellant. In response to these motions the State disclosed the existence of written and oral statements made by appellant to police and furnished copies of these statements to appellant's counsel. In addition, the State answered those specific relevant questions included in the motion, listed all of the physical evidence in the possession of the State and listed the names and addresses of all of the witnesses who were expected to be called to testify at trial. These witnesses included a nurse and examining physician at Kent & Queen Anne's Hospital and an FBI Laboratory Analyst. Appellant's counsel also received a copy of the FBI report forwarded to the State and the medical report of the Kent & Queen Anne's Hospital.

On August 27, 1981, appellant's counsel received from the State a supplemental medical report in which appellant

contends for the first time revealed that spermatozoa was found in the vagina of the victim at the initial examination. On September 1, 1981, the day the trial began, appellant's counsel moved for a continuance, giving the following reasons:

> May it please the Court, on August 27th according to the certification by the State's Attorney I was provided with a copy of a medical report from the Kent & Queen Anne's Hospital laboratory, involving the victim in this case. In that report it was revealed to me for the first time, I might add, that certain spermatozoa was present and that spermatozoa had been analyzed by the laboratory, and I believe a copy of the motion and the certification is in the court file. The certificate of service states that I received a copy. I received this copy on Saturday, which would have been, I believe, August the 29th or 30th. The significance of this, along with the Federal Bureau of Investigation report dated July 23rd, 1981, and giving, of course, a synopsis of the result of their examination, which was previously discussed in a motions hearing. The significance of the medical report, however, in this case, is that a sample from this defendant of spermatozoa may prove to eliminate him as the individual who committed this crime. On previous discovery here and some authorization for release of evidence for alleged rape, which was received by me on June 2nd, 1981. It was never revealed that there was in fact any spermatozoa present, and in fact, on page five of that report evidence of sperm or seminal fluid was checked "no." In addition, on page four of that report, spermatozoa absent/present was in fact not checked off in the vagina, cervix, vulva or other indications in the examination of the victim in this case.

Court: Mr. Wadkovsky, why was this so late?

Mr. Wadkovsky: That's when we received the

subsequent report. I think it was after I talked to Mr. Smith the last time.

Court: Who did you receive it from?

Mr. Wadkovsky: Kent & Queen Anne's Hospital, and I think it was as a result of our conversation with Mr. Smith that he asked for additional lab reports and apparently Dr. Gulbrandsen did not furnish it; the hospital furnished it. This was our original report and it was reported to Mr. Smith.

Appellant argued that the continuance should be granted to permit him to submit himself to "an antibody or HLA test" which he hoped would exclude him as the criminal agent. The ensuing colloquy then occurred:

Court: Do you have any medical evidence to say these things would happen? I don't know of any such a test where you can distinguish sperms from one person to another.

Mr. Smith: Your Honor, there are tests.

Court: Well, do you have any proof that there are tests?

Mr. Smith: No, Your Honor. Prior to Saturday I did not have any idea that this would come up.

Court: The motion is late. We are ready for trial. We have 60 jurors in here. You're late already. Of course you said you had an excuse and I told you I wouldn't find you in contempt and I'm not going to. I am going to refuse to grant a continuance. I have no evidence these things could be separated. The State may or may not use the tests. I don't know if I will even allow it. We'll get to it. You say a bald allegation that these things could be checked and separated so as to provide some evidence that the Defendant did not create the sperms in the vagina of the victim, I take it. But it's just too late in the day, and I can't find that we have any evidence that you have of any type that you could present to —

reliable evidence, that would be admissible in evidence to do this type of thing.

Mr. Smith: And Your Honor, I am saying that there has been, and Your Honor, I don't know whether or not the Court is familiar with this particular case, but there has been an instance where a man who was convicted and received 50 years in jail up north had a test run some 20 years later on this very same principle and was excluded as a result of this kind of HLA type of test.

Court: What do you have to say about this?

Mr. Wadkovsky: I never heard of the test, and I don't know what relevance it would have.

Court: We're here, and we waited for you. You said you were tied up in another court, and you were, from 10:00 until really now — what time is it now? The jury has been sitting out there all day. It's 25 minutes of 2 and now for the first time I see a motion for a continuance. Have you made any effort to check the hospital records?

Mr. Smith: Your Honor, I received the hospital records from the State's Attorney.

Court: Have you independently went over and checked the hospital records? Have you filed an order to obtain the hospital records?

Mr. Smith: No sir.

Court: Then I will find you did not use due diligence to develop this evidence. I am going to deny your motion for a continuance.

Appellant argues that the delay in receiving the supplemental hospital report was "occasioned by a cunning State's Attorney." There is not a scintilla of evidence to support this charge. The record is clear that immediately upon receipt of the supplemental report the State's Attorney furnished it to appellant's counsel. The initial hospital report was at best equivocal. At one point, it contained no checks or other indications in portions of the form headed "absent" or "present"

with respect to spermatozoa. On the next page, the answer "No" was given to the question "Evidence of sperm or seminal fluid?" Despite this apparent self-contradiction and despite the fact that the report was clearly a preliminary one which did not include the results of laboratory tests, over a three-month period appellant's counsel made no efforts to check the hospital records personally or to confer with the doctor who had prepared the report and whose name had been given to him. We are convinced that discovery proceedings were never intended to replace personal diligence in the preparation of a case for a trial. The proffer made in support of the continuance was totally insufficient to require the trial judge to grant the continuance. The HLA test was never identified by name, nor was the "case up north," in which miraculous results were obtained, ever identified by name or jurisdiction. Nothing was proffered as to the existence of the test, its reliability or its acceptance in the relevant scientific community (the medical profession), or the courts. *See Collins v. State,* 52 Md. App. 186, 447 A.2d 1272 (1982). Even if the test in question was of the type we discussed in *Mills v. State,* 28 Md. App. 300, 345 A.2d 127 (1975), the appellant failed to show that he had a reasonable expectation of securing the test results within a reasonable time, what the test results might show, or that the case could not be fairly tried without it. There was no abuse of discretion by the trial judge. *See Jackson v. State, supra.*

## II.

Appellant next raises the unique question of whether the State may properly admit into evidence testimony concerning a "lineup" wherein the services of a tracking dog were utilized to link the appellant to certain physical evidence found at the scene of the crime.

In *Terrell v. State,* 3 Md. App. 340, 239 A.2d 128 (1968), this Court made an exhaustive survey of the law concerning that portion of American folklore dealing with the ability of a dog trained to follow the human scent to track down a fugitive. In that case, Judge Thompson, speaking for this

Court, noted that "[t]he ability of a dog to follow the human scent is not an inherent characteristic, but one that must be instilled into the animal through arduous training." 3 Md. App. at 344. The first case in which an accused questioned the admissibility of evidence of tracking by a bloodhound was in *Hodge v. State,* 98 Ala. 10, 13 So. 385 (1893), where the Supreme Court of Alabama stated that it was "common knowledge" that tracking dogs, if properly trained, could track the human scent. Three years later, in *Simpson v. State,* 111 Ala. 6, 20 So. 572 (1896), the Alabama Court reiterated its position in *Hodge, supra,* thus laying the foundation for the legal supposition that such evidence may be properly introduced before the trier of fact.

The Kentucky Supreme Court, in *Pedigo v. Commonwealth,* 103 Ky. 41, 44 S.W. 143 (1898), set forth the perimeters of the rule where it stated:

[I]n order to make such testimony competent, even when it is shown that the dog is of pure blood, and of a stock characterized by acuteness of scent and power of discrimination, it must also be established that the dog in question is possessed of these qualities, and has been trained or tested in their exercise in the tracking of human beings, and that these facts must appear from the testimony of some person who has personal knowledge thereof. We think it must also appear that the dog so trained and tested was laid on the trail, whether visible or not, concerning which testimony has been admitted, at a point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated to have been made by him. When so indicated, testimony as to trailing by a bloodhound may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime of which he is accused. When not so indicated, the trial court should exclude the entire testimony in that regard from the jury. [44 S.W. at 145.]

A majority of the jurisdictions which have had the opportunity to rule on this issue have appeared to follow this rule, although some have declined.[1] The minority rule emerged in *Brott v. State,* 70 Neb. 395, 97 N.W. 593 (1903), where bloodhound evidence was held incompetent and unreliable.[2]

With the refining of the majority rule, certain prophylactic safeguards developed. Before any evidence pertaining to the results of the dog's tracking may be admitted, a proper foundation must first be laid and the handler must testify as to his own qualifications and experience as well as that of the dog and its ability to track. Factors such as the dog's experience, reliability, reputation, skill and training should be considered. Furthermore, the circumstances pertaining to the actual trailing must be shown, *e.g.,* whether the trail is fresh, *i.e.,* how much time elapsed before the dog was placed on the trail, and whether there was any interference with the dogs during the tracking. *See generally, Terrell v. State, supra,* and the cases cited therein. "Once the proper foundation has been laid the evidence may be used to identify the accused as the perpetrator or for some other reason, as long as the evidence is corroborated." *Id.* at 353. [Footnotes omitted.]

In the more recent case of *Briscoe v. State,* 40 Md. App. 120, 388 A.2d 153, *cert. denied,* 283 Md. 730 (1978), we said:

> This Court dealt with the admissibility of trailing by dogs in the case of *Terrell v. State,* 3 Md. App. 340, 239 A.2d 128 (1968). The Court in *Terrell* ruled that before any evidence pertaining to the results of a dog's tracking are admitted in evidence, a proper foundation must be laid. The handler must testify as to his own qualifications and experience and that of the dog, along with an account of the dog's ability to track. Next, the circumstances pertaining to the trailing itself must be shown. For example, was the

---

1. For an exhaustive review of the case law on both the majority and minority views, *see* Terrell v. State, *supra,* at 346-349, n.2 and 3.

2. For a detailed discussion of the minority view, *see* State v. Dickerson, 77 Ohio St. 34, 82 N.E. 969 (1907).

trail fresh, or was there other traffic in the area, or were the dogs interfered with while tracking, or were the dogs placed on the trail at a point where the perpetrators were reasonably assured to have been?

There is no contention that the prosecuting witness in this case was not the victim of a first degree rape. The only factual issue is whether the appellant was the criminal agent. At trial, appellant offered a motion *in limine* to exclude any of the testimony concerning the use of a tracking dog and any evidence resulting therefrom. The trial court conducted a preliminary hearing, out of the presence of the jury, to permit the introduction of evidence to establish a proper foundation for the testimony. The record discloses that the State produced as a witness Lt. Weldon L. Wood, a shift commander of the Charles County Sheriff's Department. Lt. Wood testified that in addition to his other duties he was the bloodhound handler for the Sheriff's Department, a position he created himself in 1968. He had been a member of the National Police Bloodhound Association since 1970 and was elected chairman of the board of trustees in 1975 and vice-president of the Association in 1980.

In 1974, after attending several training seminars since 1970, Lt. Wood prepared a manual called "Bloodhounds in Law Enforcement." The manual was accepted by the FBI Academy. In 1976, he prepared a training manual for the National Association which was adopted as the official training manual of the Association. The witness further testified that he had previously qualified as an expert on the training and handling of bloodhounds in the Charles County Circuit Court. Lt. Wood stated unequivocally that a training regimen used in accordance with the training manual would, within a period of less than a year, produce a trained dog. Lt. Wood testified that he was familiar with the background of Deputy Dempsey, who had trained Shallcross Sniffer, the dog used in this case, from the time he was a puppy. He further had seen the dog used in a demonstration

at Appomattox, Virginia, and gave his opinion that the dog had been properly trained. Deputy Dempsey testified he had been a member of the National Police Bloodhound Association for two years. He stated that he had taken custody of Sniffer at the age of three weeks and that at the time of the "lineup" the dog was one and a half years old. The dog was a purebred, registered with the AKC and the National Police Bloodhound Association. Sniffer's training began when he was six weeks old and continued for the entire year and a half prior to the incident in this case. The deputy contended that Sniffer's success rate in practice trails was 99%. He had been used in twenty actual cases and had on three or four cases trailed a scenting object to a suspect or a lost person.

The scent article which was used in the so-called "lineup" in this case was a knit cap which the intruder had picked up on the premises and had used to hide the top portion of his head. The cap was discovered after the rape and was placed in a plastic evidence bag without any person touching the cap. The evidence was that the cap was discovered by Lt. Cook while investigating at the scene and was identified as the particular cap the suspect wore. Lt. Cook picked up the cap with a broomhandle and laid it on the ground without touching it. Deputy Dempsey at approximately 2:00 P.M. took the bloodhound to the immediate area, put it in harness, took it to the scent article (the cap) and told Sniffer to "go find." The dog sniffed the scent several times and then proceeded to trail. Dempsey stated that the dog followed a short trail out the back of the victim's residence, across the front yard and came to a stop at a large blade machete lying in the yard. The dog followed the trail down a steep embankment to the edge of a hardtop macadamized road. At that point the deputy found tire tracks and advised the investigators that the scented trail was exhausted.

Several hours later the appellant was apprehended and taken to the scene of the crime for possible identification. The victim was unable to identify positively the appellant, but told the sheriff that her assailant was approximately the same height and build as appellant. Shortly thereafter, at approximately 5:15 P.M., Lt. Wood and Deputy Dempsey

arrived at the scene. The plastic bag containing the scented article was opened and placed on the ground. Deputy Dempsey testified that the following occurred:

Q   And at that time the dog was scented?

A   Yes sir, he was.

Q   And what were the circumstances of that particular situation?

A   Before the dog was scented a group of police officers and the defendant stood in a line approximately five feet apart and approximately 25 or 30 yards from the canine vehicle. The dog was brought out, put in the —

Court: Let's see, they were in a line five feet apart and what?

A   Yes, sir. In a horizontal manner, and they were 25 to 30 yards away from the canine vehicle. The dog was brought out —

Q   Where was the dog at that time?

A   The dog was in the compartment of the canine vehicle.

Q   Now could he see these people?

A   No sir. It is a sealed compartment and only has a rear vision point.

Q   And when these individuals were placed in a line what happened then?

A   The dog was brought out, he was put in harness, taken to the scent article, the tracking lead was snapped to him and he was given the command, he was scented off the scent article, went directly across to the group of individuals, stopping at the Defendant who was standing middleway to the line of individuals, went around in back of the Defendant in a close circle, and then sat at the Defendant's feet.

Q   And those actions indicated what, if anything, to you?

A   It indicated to me that he —

Mr. Smith: Objection.

Court: Well, overruled. I don't think we really need it for the purpose of this, but go ahead.

A   Can I answer it?

Court: Yes, go ahead and answer it. We are only dealing with reliability.

A   In my opinion the dog indicated to me that he had matched the scent from a scent article to an individual in that group of persons.

Appellant argued that the three hour lapse in time from the initial contact of the dog with the scent object and the subsequent lineup identification made the testimony inherently unreliable. There was, however, testimony from Deputy Dempsey that Sniffer had previously successfully run a trail eight hours old. He next attacks the training of Deputy Dempsey in the use of bloodhounds; however, from our perusal of the record, we cannot conclude that the trial judge erred in finding that the deputy was adequately trained. Finally, appellant contends the lineup was inherently unreliable because the dog was familiar with other persons in the lineup. The trial judge, in rejecting this argument, said:

Well, as I understand the testimony, it is the scent, not the identification or familiarity, that guides the dog's nose, so to speak, to the find. And in fact, a lot of police officers and friends do volunteer for the scent, but they are trained to eliminate everything but the scent, and we are dealing not with individuals, but the scent. And for that reason I find it is reliable. The dog is to scent something, and not to be confused by an individual — be they police officers or handlers or whatever it is. They are trained for scent and that's all we are dealing with. So I find the evidence is reliable. . . .

On the basis of the evidence offered in the hearing, out of the presence of the jury, we find no error in the trial judge's conclusion that the State had met the burden imposed upon

it by *Terrell, supra,* and *Pedigo, supra,* to establish the reliability of the testimony as offered. Although the use of the dog in this case was novel, we point out that the attempted identification was arranged not by the State's Attorney but by the police in the course of their investigation and before any charges were placed against the defendant. We agree with the trial judge that the evidence was admissible. The weight to be accorded the evidence was for the jury to determine as the ultimate triers of the facts. The record discloses that there was rigorous cross-examination of both Lt. Wood and Deputy Dempsey as to the expertise and the reliability of the bloodhound's participation in the investigation of the commission of the crime. It was for the jury to decide whether it was convinced beyond a reasonable doubt that the accused had committed the crime.

## III.

Finally, appellant contends that the trial judge abused his discretion in denying appellant's motion to compel discovery. In his motion for discovery and inspection, appellant, pursuant to Maryland Rule 741 b 4, requested that he be furnished with "[a] copy of all written reports or statements made in connection with the defendant's case by each expert consulted by the State, including the results of any physical or mental examination, scientific test, experiment or comparison." By letter to the State's Attorney dated June 8, 1981, defense counsel requested the name and address of the expert who examined and tested the items delivered to the FBI by Lieutenant LaMonte E. Cook. The FBI report was filed on August 27, 1981. On August 19, 1981, appellant moved to compel discovery not only of the conclusions of the examination but the examination and analysis itself. The trial judge ruled that defense counsel had been furnished what he asked for when he was given the FBI report and that any further information should be developed by cross-examination or by the defendant's own investigative efforts. He found further that no additional motion was made until the day of the hearing on the motion to suppress, when

it was made by way of an oral request. Under all the circumstances, the trial judge denied the appellant's request for further discovery. We do not find this was an abuse of discretion.

*Judgments affirmed.*
*Costs to be paid by appellant.*