469 A.2d 442

**Gregory Bernard ROBERTS**

v.

**STATE of Maryland.**

**No. 14, Sept. Term, 1983.**

Court of Appeals of Maryland.

Dec. 28, 1983.

Edward Smith, Jr., Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

RODOWSKY, Judge.

The principal issue on this appeal from a rape conviction involves alleged error in the admission of evidence. A law enforcement officer was allowed to express the opinion that Shellcross Sniffer (Sniffer) had indicated that a cap known to have been worn by the rapist had been worn by the accused. Sniffer is a dog.

Gregory Bernard Roberts (Roberts or Petitioner) was convicted at a jury trial in the Circuit Court for Kent County of first degree rape, unlawfully wearing and carrying a dangerous weapon, daytime housebreaking and attempting to steal goods valued at less than $300. He was sentenced to confinement for 50 years on the rape conviction, with lesser and concurrent sentences on the other charges. His convic-

tion was affirmed by the Court of Special Appeals. *Roberts v. State,* 53 Md.App. 257, 452 A.2d 1271 (1982). We granted Roberts' petition for certiorari which asserts that the trial court erred in three respects:

1. "[I]n allowing the prejudicial use of a dog line-up into evidence at trial";

2. In refusing a continuance for the purpose of possibly obtaining a scientific analysis suggested by information furnished to the Petitioner on the eve of trial in response to discovery requests; and

3. In failing to order the State to comply with the full scope of Petitioner's requested discovery concerning the report of an expert who had analyzed paint samples.

For the reasons hereinafter stated, we shall affirm.

The offenses occurred at the victim's home, a large, hilltop house in Kent County. A private driveway from the house to the nearest public road is one-quarter to one-half mile in length. That public road can also be reached on foot from the house *via* a path through woods on the hillside. The crimes were committed shortly after 1:00 p.m. on March 11, 1981. The victim's husband was in town, her children were at school, and she believed she was alone in the house. Upon hearing a noise, the victim investigated. In the living room she encountered a man brandishing a machete-like knife. This weapon was a corn knife which was owned by the family. It had been used for weeding and left on the north side of the house under the kitchen windows. The intruder was dressed in a knit ski cap, army jacket, dungarees, combat boots and gloves. Both the ski cap and the jacket belonged to members of the household and had been hanging in a small vestibule or mudroom adjacent to a rear door of the house. The intruder wore the ski cap pulled down to just above his eyes and had covered the lower portion of his face with a bandana, so that only a band across his eyes was uncovered. The victim was blindfolded and kept blindfolded throughout the occurrence. She was never able to make an identification, but did describe the

man as black, approximately 5 feet 8 inches tall, and of stocky build.

After the rape, and after the man had searched the house for valuables and departed, the victim went to the home of a neighbor who telephoned the sheriff's office. That call was received at approximately 1:53 p.m. Among the officers responding was Deputy William J. Dempsey (Dempsey), together with his bloodhound, Sniffer. The ski cap worn by the rapist had been discarded on the floor of the mudroom at the victim's home. In order not to contaminate any scent on the cap, an investigator used a broom handle held at arm's length to pick up the cap and place it on the ground outside of the mudroom door. This occurred about 2:20 p.m. Dempsey clipped the 15-foot trailing lead, or leash, to Sniffer's tracking harness, Sniffer took the scent from the cap and Dempsey gave the command, "Go find." The cap was retained in an evidence bag.[1]

Sniffer trailed to a point in the garden at which the corn knife was lying. This evidence was bagged. Continuing to follow the trail, Sniffer led Dempsey, who in turn was followed by other officers, down the footpath to the public road and then along the public road for approximately 200 yards to a place where the unpaved shoulder of the road widened. At that place Sniffer lost the scent, but there were automobile tire tracks in the sandy soil. Investigation in the area produced two fishermen who had observed an automobile parked, during the time when the offenses were occurring, at a place off the road below where the tire tracks were discovered. They described the car as a Chrysler Corporation product with a maroon vinyl top over gray and

---

1. Evidence bags used in the investigation were plastic bags of the type commonly used to line garbage cans. In the bagging process, the object retained, including specifically the hat involved here, is not directly in contact with the investigator. The investigator holds the bag at the bottom and pulls it inside out over his arm. Then, through the bag, the investigator grasps the object and pulls the bag back down over the object. The bag is then tied closed.

with damage to the left side. This description was broadcast over police radio.

Kent County Sheriff Allan Blizzard (Blizzard) heard the automobile description. At approximately 3:15 p.m., while driving to the crime scene, he observed a car answering the description parked outside of the house of Petitioner's mother. There Blizzard, after having cautioned Roberts, questioned him. Roberts is a black male, approximately 5 feet 8 inches tall and of stocky build. He was wearing a T-shirt, dungarees and tennis shoes. Roberts acknowledged having parked the car for about five minutes off the road near the victim's house while Roberts said he was relieving himself in the woods. Petitioner consented to a search of the car which revealed a pair of combat boots and a pair of gloves in the trunk. These were taken by Blizzard with Roberts' consent. Petitioner also agreed to accompany Blizzard to the victim's house for a showup.

What Petitioner calls a "dog line-up" was held on the lawn outside of the victim's home at approximately 5:15 p.m. that same day. Roberts stood in the middle of a line of four officers. The group was arrayed side by side, approximately three to five feet apart. At least one of the officers was in civilian clothes. The ski cap was dumped from the evidence bag onto the ground at a point 25 to 30 yards from the five person group. Sniffer was taken from the motor vehicle used to transport him, and from which the group was not visible to him. His trailing lead was attached, and he was given the scent and the trailing command. The bloodhound went to Roberts, circled about him and then sat at Roberts' feet. Sniffer was put back into the vehicle and the relative positions of the five individuals were altered, with Roberts being placed at one end. The same process was repeated with the same result. Dempsey testified that "[t]his indicated to me that the dog had matched a human scent from the scent article to a human being in that particular line."

The corn knife used by the rapist to force the victim into submission and the gloves recovered from Roberts' car were

among objects sent to the F.B.I. laboratory for analysis. The blade of the corn knife had a blue paint finish. Particles of blue paint were found in debris brushed from the fibers of Roberts' gloves as part of the laboratory examination. Comparison of the results of various tests performed on the paint on the blade and the paint particles revealed that the colors, the color reactions, the type of paint and the chemistry of the paint all matched. In the opinion of the F.B.I. chemist, the paint particles removed from Roberts' gloves either originated from the paint on the corn knife blade or from some other source painted with paint which had been made in exactly the same way and which was in the same state of deterioration as was the paint on the corn knife blade at the time of the examination.

(1)

■ The only ground which has been preserved for review by this Court for the inadmissibility of Dempsey's opinion concerning Sniffer's match of scents is that the "dog lineup" in this case was impermissibly suggestive and that, consequently, it was not a form of dog tracking which the trainer or handler may describe in evidence. Roberts' point is that all of the persons in the "line-up" were known to the dog. He argues that "[a]lthough smell is supposed to guide the dog, familiarity may have led the dog to the stranger," namely Roberts.[2]

---

2. This is essentially the ground of objection which had been raised in Petitioner's "Motion In Limine To Suppress Evidence." In argument to the trial court at the conclusion of an evidentiary hearing held out of the presence of the jury Roberts also objected to Dempsey's qualifications and to Sniffer's reliability in trailing. However, in his petition for certiorari Roberts states that "[t]he tracking of a bloodhound in the trial of this case was simply not the issue presented at the time of the Appellant's Motion In Limine, nor at the point [at] which Appellant's counsel objected to its introduction, nor was it so before the Court of Special Appeals." The petition did not challenge Dempsey's testimony interpreting Sniffer's actions on the occasion of the line-ups on the ground that Sniffer was not a reliable tracker or that Dempsey was not qualified to interpret Sniffer's actions. Petitioner also argued in the petition that Dempsey's "experiment . . . was not tracking, nor trailing . . . ." In his brief to this Court,

Applying the test laid down in *Terrell v. State,* 3 Md.App. 340, 239 A.2d 128 (1968), the circuit judge initially concluded that Sniffer had demonstrated reliability in tracking and that Dempsey was qualified to interpret the dog's actions. The trial court then treated the interpretation of Sniffer's actions at the line-up as a form of bloodhound evidence. Thus, although Roberts' certiorari petition does not challenge the trial judge's threshold determination, some background review of the law of bloodhound evidence is required.

*Terrell* held that, under the circumstances of that case, dog tracking evidence had been properly admitted and formed part of a probable cause basis for a warrantless arrest. Unlike the case at bar, in which the dog started from a scent article, the tracking trained German Shepard in *Terrell* was placed on the trail actually taken by robbers as located by coins which they had dropped in their flight on foot from the crime scene, a motel in Silver Spring. The handler testified that the dog tracked from the coins over approximately two blocks to a car containing persons later identified to be the robbers. Judge Thompson, writing for the *Terrell* court, made a full review of the then legal authorities and pointed out that decisions in 19 jurisdictions had admitted tracking evidence when an adequate foundation had been laid, while in six jurisdictions there were decisions excluding such proof for a variety of reasons. Today, properly predicated evidence of tracking by dogs has been held to be admissible in 28 states and in the District of Columbia on the issue of identification. *See* Annot., 18

---

Roberts expands his arguments beyond his petition for certiorari and attacks the sufficiency of the proof relating to (1) the demonstrated past reliability of Sniffer in trailing, (2) the qualifications of the handler, Dempsey, (3) the state of the trail, and (4) corroboration of the opinion interpreting the bloodhound's actions. These questions of evidentiary sufficiency have not been preserved for review on certiorari. MD.R. 813 a.

A.L.R.3d 1221, 1225–27 and 106, 107 (1968 & Supp.1983).[3]
Five states apparently would exclude tracking evidence for
identification purposes as too unreliable, without regard to
the foundation laid. 18 A.L.R.3d at 1228–29.[4] In a case of
first impression the Supreme Court of Connecticut recently
decided to admit tracking evidence and stated:

> It is well settled in the vast majority of jurisdictions
> which have addressed the question that evidence of the
> tracking by dogs of the scent of a suspected criminal is
> admissible to prove the identity of the accused in a crimi-
> nal prosecution, provided that a proper foundation has
> been laid for the admission of this evidence. [*State v.
> Wilson,* 180 Conn. 481, 488, .429 A.2d 931, 935 (1980).]

No court has held, in the 15 years since the *Terrell* decision,
that dog tracking evidence can never be admitted.

■ We join the majority and hold that evidence of the
tracking by a dog of the scent of a suspected criminal is not
per se inadmissible as to identification. Because of the way
in which the instant case comes to us, we need not at this
time lay down any tests for the required foundation for the
admissibility of such evidence nor, indeed, need we opine
whether prescription of a hard and fast test for all cases is
even possible. See *People v. Craig,* 86 Cal.App.3d 905, 915,
150 Cal.Rptr. 676, 682 (1978) ("When dealing with animate
objects ... we must assume each and every unit is an
individual and is different from all others.").

In the case at bar Dempsey's evidence was that Sniffer
had been trained to trail only human beings and that Snif-

---

3. Citing *Terrell,* the editors classify Maryland as a majority rule
state.

4. *Terrell* listed New York as a "minority oriented" jurisdiction. 3
Md.App. at 347, 239 A.2d at 132.. This classification was based on
*People v. Whitlock,* 183 A.D. 482, 171 N.Y.S. 109 (1918). Subse-
quently a trial court in Oneida County, N.Y., admitted tracking
evidence and distinguished *Whitlock* as holding only that the particu-
lar foundation there was insufficient. *See People v. Centolella,* 61
Misc.2d 723, 305 N.Y.S.2d 279 (1969); *People v. Centolella,* 61
Misc.2d 726, 305 N.Y.S.2d 460 (1969).

fer's method of indicating a find (the match of the scent trailed to a specific human) was to sit at the feet of the subject or, if the subject were lying down when found, to sit on the subject. Petitioner's point that Sniffer may have sat at Roberts' feet because his scent was the only one unfamiliar to Sniffer is contrary to all of the evidence relating to Sniffer's training. The dog is a purebred bloodhound, born April 3, 1979. It was given to Dempsey when it was six weeks old by a breeder in Pennsylvania on condition that it be trained for law enforcement work. Dempsey trained the dog in accordance with the manual adopted in 1978 by the National Police Bloodhound Association. The training principally consisted in Sniffer, while on a leash held by Dempsey, time and again following various trails laid by Dempsey's neighbor. As training progressed, the trails were made longer, and the scents older and more complicated by other scents. Practice trailing was done over different types of terrain and under different weather conditions. Sniffer had a 99% success rate in practice trailing. Only once, during the initial training period, had Sniffer been temporarily distracted from the scent he was commanded to trail. That occurred when the neighbor's wife had crossed the trail carrying a platter of fried chicken. Sniffer had been used in 20 actual cases prior to March 11, 1981 and had a success rate of 85%. A trailing is considered successful if it results either in a find or if the dog follows the trail to the end of the scent, as determined by other facts developed in the investigation. For example, if investigation determines that the point beyond which the dog was unable to trail was the place where the subject entered an automobile, the trailing is considered successful. Prior to the date of the subject crime the longest trail which Sniffer had successfully followed was over 6.5 miles and the oldest trail was between eight and ten hours. Dempsey testified that once Sniffer is tracking, he is not distracted. As specific examples, Dempsey said Sniffer is not distracted by *people,* noise, dogs or guns.

Weldon L. Wood, of the Charles County Sheriff's Department, who is the author of the training manual used by Dempsey, also testified for the State. He explained how trained bloodhounds do not necessarily follow the exact path taken by a subject. Instead, these dogs trail the scent of the subject which may be carried by the wind to the side of the precise line along which the subject traveled. A bloodhound can shortcut the actual footpath trail of a subject if the dog "winds" the subject.

"Dog line-ups" have been involved in a few of the reported tracking cases. In *United States v. Gates*, 680 F.2d 1117 (6th Cir.1982) (per curiam) the police had preserved a sandal lost by a fleeing robber. Eight months later, the accused and other persons were assembled in a line-up. An experienced tracking dog was scented on the sandal and promptly placed its head on the accused's lap, an action which the handler interpreted as a match of scents. This evidence was held to have been properly admitted. That same dog was utilized in *United States v. McNiece*, 558 F.Supp. 612 (E.D. N.Y.1983). A pair of bolt cutters used by the thief had been found at a crime scene. After the accused was apprehended, the dog was scented on one of the accused's socks and presented with a display of tools. Among them were the bolt cutters to which the dog reacted. A motion to suppress this evidence was denied. Somewhat analogous to the line-up cases is *State v. Iverson*, 187 N.W.2d 1 (N.D.), *cert. denied*, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971). While the accused was being questioned in a police station concerning a murder committed 24–48 hours earlier, the police brought a bloodhound to the police station. Outside of the front entrance the bloodhound was scented on a pillowcase taken from the victim's apartment. The dog trailed into the station and to the accused. Evidence interpreting this action by the dog was held to have been properly admitted. However, in each of the three foregoing cases the dogs involved were owned and handled by private individuals. Any degree of familiarity which the dog may

have had with other persons present at the time of the "identification" was simply not raised or discussed.

Of particular significance in the instant matter is that the two decisions involving types of line-ups treat the problem as presenting a form of tracking and rely on principles established in cases involving more conventional forms of tracking. Indeed no evidence was presented that the dog in *Gates* had ever, prior to the identification there involved, made a find from among a group of humans arrayed for the purpose of having the dog attempt to match one of them with the scent from an article known to have been in contact with the body of the actual culprit. One judge who concurred only in the result in *Gates* would not have admitted evidence of the dog's reaction, but the *Gates* majority did not treat the absence of prior human line-up experience as legally significant.

We have also surveyed to some extent the general literature concerning tracking dogs and find no indication that a trained and reliable tracking dog will signal a find because the person found is the only one unfamiliar to the dog from among a group of persons.[5] To the contrary, so far as we can determine from the literature, the purpose of training a tracking dog is to keep it focused on the given scent and undistracted by other scents.

---

**5.** Numerous books and articles discuss the nature of dog tracking. *See, e.g.,* C. Brey and L. Reed, *The Complete Bloodhound* 71–146 (1978); S. Chapman, *Police Dogs in America* 28–31 (1979); E. Hafez, *The Behavior of Domestic Animals* 449–50, 472–74 (2d ed. 1969); G. Johnson, *Tracking Dog Theory & Method* (2d ed. 1977); B. Lowe, *Hunting the Clean Boot* 203–21 (1981); L. Whitney, *Dog Psychology* 57–65, 264–70 (1964) (see, in particular, the demonstration described by Dr. Whitney, a veterinarian, geneticist, and noted bloodhound expert, at 62); Caras, *Bloodhound,* 82 Science Digest 62 (1977); Handy, Harrington and Pittman, *The K–9 Corps: The Use of Dogs in Police Work,* 52 J.Crim.L., C. & P.S. 328 (1961); Kalmus, *The Discrimination by the Nose of the Dog of Individual Human Odours and in Particular of the Odours of Twins,* British Journal of Animal Behavior 25–31 (1955); Sloan, *Dogs in War, Police Work and on Patrol,* 46 J.Crim.L., C. & P.S. 385 (1955); *How Bloodhounds Track,* 62 Science Newsletter 214 (1952).

■ Whenever a court admits bloodhound evidence of a dog's having tracked over an area traversed by one or more human beings other than the subject, the court is essentially dealing with a line-up case. The dog has encountered an array of scents and the question is whether the dog has continued to follow the particular scent with which the trailing originated. For example, the dog in *Terrell, supra,* tracked through part of the business district of Silver Spring. The dog in *Briscoe v. State,* 40 Md.App. 120, 388 A.2d 153, *cert. denied,* 283 Md. 730 (1978) tracked over the parking lot of a small shopping center. Testimony in the instant case is that Sniffer had, prior to March 11, 1981, been placed on the trail of a robbery suspect at a point nearly seven miles outside of Chestertown where the suspect had abandoned a car and fled on foot. Sniffer tracked the suspect into downtown Chestertown, to a second-floor apartment, where the arrest was made.

■ At the conclusion of the hearing held out of the presence of the jury in the case *sub judice,* the trial court found beyond a reasonable doubt that Sniffer was sufficiently reliable in trailing and Dempsey was competent to interpret the dog's actions. The court further found beyond a reasonable doubt that the line-up test was conducted in a reasonable and reliable manner. The court said:

Well, as I understand the testimony, it is the scent, not the identification or familiarity, that guides the dog's nose, so to speak, to the find. And in fact, a lot of police officers and friends do volunteer for the scent, but [the dogs] are trained to eliminate everything but the scent, and we are dealing not with individuals, but the scent. And for that reason I find it is reliable. The dog is to scent something, and not to be confused by any individual—be they police officers or handlers or whatever it is. They are trained for scent and that's all we are dealing with. So I find the evidence is reliable . . . .

We agree. The trial court did not err in failing to rule that the composition of the line-up was prejudicial because the

only person in it with whom Sniffer did not have some familiarity was Roberts.

### (2)

A continuance requested by Roberts was denied by the trial court and Roberts contends that the denial is grounds for reversal. Roberts based the request on his desire to have a particular scientific test conducted on sperm detected as part of a medical examination of the victim. Although the application for a postponement was not made until immediately before the start of trial, we shall assume, *arguendo,* that the lateness of the continuance request was justified. However, because Roberts did not make even a minimal showing that the test which he hoped to have performed was appropriate to the object sought to be proved, the trial court did not abuse its discretion. We explain.

The criminal information on which Roberts was tried was filed on April 22, 1981, and on May 13, 1981 he entered a plea of "Not Guilty." At that time Roberts filed discovery requests pursuant to MD.R. 741. Among these requests he sought (1) disclosure of any scientific or medical test results which indicated that bodily substances collected by the State were not those of the accused and (2) production of all written reports, and the substance of all oral reports, made by each expert consulted by the State. This request embraced reports generated at Kent and Queen Anne's Hospital where the victim had been taken for medical examination on the afternoon of the rape. Hospital reports were not included in the State's initial discovery response of May 25 but, on or about June 2, 1981, Roberts' counsel received a copy of a hospital report on a five-page form. Page 4 of the form, which was designed to record the presence or absence of spermatozoa, was not filled in. However, on page 5, under the heading, "Interpretation," the question, "Evidence of sperm or seminal fluid?," was answered "No." As a result of a conversation between the State's Attorney and Roberts' counsel, in which defense counsel asked about additional lab reports, the prosecutor apparently made further

inquiry of the hospital and obtained a two-page report of various laboratory tests which the hospital had not previously furnished to the State. This material was filed by the State in court on Thursday, August 27, 1981, and a copy was mailed to defense counsel at his Baltimore office where it was received on Saturday, August 29. Trial was scheduled to commence on Tuesday, September 1. In a section of the report headed "Miscellaneous Laboratory," the lab technician had noted "spermatozoa present" and "spermatozoa observed on PAP smear" under date of March 11, 1981. On September 1 defense counsel presented the trial court with a written motion for continuance which referred to the recently produced lab report and which asserted that "[s]cientifically, it is possible to isolate and differentiate the anti-body type of an individual's spermatozoa." The motion sought a 60-day postponement.

At oral argument on the motion Roberts' counsel contended that a comparison of the sperm found on examination of the victim with a sample from the accused might eliminate the accused as the rapist.[6] The following colloquy then transpired:

COURT: Well, I don't know of any scientific admissible test that would exclude him, other than paternity. How would it exclude him?

[DEFENSE COUNSEL]: Your Honor . . . the paternity test is a blood test. This test is an antibody or HLA test, is what it's called.

COURT: Do you have any medical evidence to say these things would happen? I don't know of any such a test where you can distinguish sperms from one person to another.

---

**6.** The record does not reflect that defense counsel had determined whether the spermatozoa sample referred to in the lab report had been retained, and, if retained, whether it had been preserved in any manner which might be required to permit the intended scientific test to be performed on it almost six months after the specimen had been obtained. We express no opinion on this aspect of Petitioner's continuance request.

[DEFENSE COUNSEL]: Your Honor, there are tests.

COURT: Well, do you have any proof that there are tests?

[DEFENSE COUNSEL]: No, Your Honor. Prior to Saturday I did not have any idea that this would come up.

COURT: I have never heard of any such tests.

The trial court refused any continuance. Among the reasons given was that the court had "no evidence these things could be separated."

 Absent an abuse of discretion, denial of a continuance is not grounds for reversal. Where the requested continuance is sought for the purpose of obtaining evidence, one of the matters which the proponent of the continuance must show is that the evidence would be competent and material. *See Jackson v. State,* 214 Md. 454, 459, 135 A.2d 638, 640 (1957), *cert. denied,* 356 U.S. 940, 78 S.Ct. 784, 2 L.Ed.2d 816 (1958). Roberts failed to make any showing that the "anti-body or HLA test" could demonstrate the probability that a specific man was not the source of a particular sperm specimen. Even within the time constraints which defense counsel faced, his burden of showing an abuse of discretion requires, at a minimum, that some demonstration have been made to the trial court that the test which might possibly have been performed during a continuance was at least of a type appropriate to the object of possibly excluding Roberts as the rapist.

The HLA (human leukocyte antigen) test "is based on the identification and typing of antigen markers found in white blood cells and other tissues of the body." Note, *Use of Human Leukocyte Antigen Test Results To Establish Paternity,* 14 Ind.L.Rev. 831, 833 n. 11 (1981). The trial court indicated familiarity with the HLA test in a paternity context.[7] However, applicability of the HLA test to a sperm

---

7. Chapter 784 of the Acts of 1982 amended Md.Code (1957, 1981 Repl.Vol., 1981 Supp.), Art. 16, § 66G to provide for admission into evidence in paternity proceedings of the results of blood tests in

sample, even if scientifically possible, is hardly the type of fact of which the trial court could be expected by defense counsel to take judicial notice. Nor has Roberts cited to us any scientific or legal authority which recognizes the use of the HLA test for the purposes represented to the trial court.[8] After giving Roberts all benefits flowing to him from his belated receipt of the lab report, the record nevertheless does not reflect an abuse of discretion.

(3)

Petitioner's remaining contention involves the comparison of paint from the knife with paint from the gloves. In response to Roberts' discovery request the State furnished him with a copy of a report from the F.B.I. laboratory which stated that paint from the two sources matched. At a suppression hearing on August 19, 1981 defense counsel pointed out that the F.B.I. report was wholly conclusory and the trial court was asked to order the State to obtain for Roberts from the F.B.I. a description of all tests performed and the specific findings of each test. This the trial court

---

cases in which exclusion of the putative father as the biological father was not established "if testing was sufficiently extensive to exclude 97.3 percent of putative fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3 percent." The HLA test is part of the background underlying this amendment.

8. Roberts' sole reference—Bornstein, *Investigation of Rape; Medicolegal Problems,* Medical Trial Technique Quarterly 229 (1963)— does not support his position. We have also reviewed a number of cases and articles which describe HLA testing. *See, e.g., Cramer v. Morrison,* 88 Cal.App.3d 873, 153 Cal.Rptr. 865 (1979); *Cutchember v. Payne,* 466 A.2d 1240 (D.C.App.1983); *Crain v. Crain,* 104 Idaho 666, 662 P.2d 538 (1983); *State ex rel. Hausner v. Blackman,* 233 Kan. 223, 662 P.2d 1183 (1983); *Perry v. Commonwealth ex rel. Kessinger,* 652 S.W.2d 655 (Ky.1983); Ellman and Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?,* 54 N.Y.U.L.Rev. 1131 (1979); Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J.Fam.L. 543 (1977–78); and Note, *Blood Test Evidence in Disputed Paternity Cases: Unjustified Adherence to the Exclusionary Rule,* 59 Wash.U. L.Q. 977 (1981). Our research does not confirm that the HLA test may be performed on sperm samples in the manner suggested by Roberts to exclude a specific man as the sample source.

declined to do and Roberts here contends that the ruling was an abuse of discretion.

■ Roberts' oral request to the trial court was in the nature of a motion to compel discovery, which is governed by MD.R. 741 e 2. Without in any way implying that the circuit court's ruling could not be sustained because of one or more procedural irregularities on Roberts' part, we shall address the merits.

MD.R. 741 b 4 provides:

Upon the request of the defendant, the State shall:

. . . .

Produce and permit the defendant to inspect and copy all written reports or statements made in connection with the particular case by each expert consulted by the State, including the results of any physical or mental examination, scientific test, experiment or comparison, and furnish the defendant with the substance of any oral report and conclusion made in connection with the particular case by each expert consulted by the State, including the results of any physical or mental examination, scientific test, experiment or comparison.

■ Petitioner does not contend that the State failed to produce "all written reports or statements" or that the State failed to furnish him with "the substance of any oral report and conclusion," received by the State prior to Petitioner's motion. We shall assume that underlying the written report sent by the F.B.I. to the State in this case were lab notes of the expert which recorded the particular tests or examinations made, together with the results thereof, expressed in terms of the particular test or examination. Thus, Roberts' position necessarily is that MD.R. 741 placed an obligation on the State to go back to the F.B.I. for further elaboration concerning the paint comparison. There is no such obligation.

Roberts' initial demand for production of reports of experts is addressed under § b, dealing with matters discoverable upon request by the defendant. Section a deals with

discovery to be furnished to a defendant without the necessity of a request and applies to:

1. Any material or information within [the State's Attorney's] possession or control which tends to negate the guilt of the defendant . . . or would tend to reduce his punishment therefor; [and]

2. Any relevant material or information regarding: (a) specific searches and seizures, wire taps and eavesdropping, (b) the acquisition of statements made by the defendant, and (c) pretrial identification of the defendant by a witness for the State.

Paragraph 3 of § a then provides that the State's Attorney's obligations under § a

extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office.

No contention is made that Roberts' motion to compel discovery went to material of the type covered by paragraphs 1 or 2 of MD.R. 741 a. There is no provision in § b comparable to that found in paragraph 3 of § a. This difference between §§ a and b of the rule is deliberate and results in there being no obligation on the State to have produced for Roberts material underlying the written report received by the State.

Prior to present MD.R. 741 discovery in criminal causes was governed by former MD.R. 728 under which the reports of experts were not discoverable by a defendant. *See Veney v. State,* 251 Md. 159, 166, 246 A.2d 608, 613 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969). MD.R. 741 was adopted by order dated January 31, 1977, effective July 1, 1977. That order generally revised the rules in criminal causes as a consequence of the Fifty-Third Report of the Standing Committee on Rules of Practice and Procedure. As reflected by the report, in preparing the proposed new criminal rules the Rules Committee had uti-

lized, *inter alia,* the ABA standards. Section 2.4 of ABA Standards, Discovery and Procedure Before Trial (1970) recommended placing a general obligation upon the prosecuting attorney to "use diligent good faith efforts to cause . . . material to be made available to defense counsel," where the material requested by the defense "would be discoverable if in the possession or control of the prosecuting attorney . . . ." MD.R. 741 did not embody that standard *in haec verba.* Nor is any language similar to that standard included in § b of Rule 741.

Further, MD.R. 741 b 4 may be compared with MD.R. 741 d 2, dealing with discovery by the State from the defendant of reports of experts. Other than the fact that § b 4 applies to reports of all experts consulted by the State, while § d 2 applies to reports of experts to be used at trial, the latter provision tracks the former.[9] Minutes of the Rules Committee meeting held in March 1975 reflect that the then working draft of a new criminal discovery rule was amended so as to make discoverable by the State not only an expert's written report which the accused intended to use at trial, but also "the substance of any [oral] opinions of an expert, *and the reasons therefore* [sic] . . . ." (Emphasis added.) However, prior to the Fifty-Third Report, the italicized aspect of the discovery rule was conformed to present § b 4. In view of the fact that under the criminal rules then in effect there was no discovery of even the written reports of experts, some express language, in addition to providing

---

**9.** MD.R. 741 d 2 reads:

Upon the request of the State, the defendant shall:

. . . .

2. Reports of Experts.

Produce and permit the State to inspect and copy all written reports made in connection with the particular case by each expert which the defendant intends to call as a witness at the hearing or trial, including the results of any physical or mental examination, scientific test, experiment or comparison, and furnish the State with the substance of any oral report and conclusion made in connection with the particular case by an expert which the defendant intends to use at the hearing or trial, including any physical or mental examination, scientific test, experiment or comparison.

simply for the production of written reports, and for the furnishing of oral statements, of experts, was required in order to impose on a party the further burden of disclosing more detailed information which was known to the expert and which underlay matters communicated by the expert to a party's counsel. This was not done in the rule as adopted. Indeed, a provision, temporarily carried in a draft of § d 2, which arguably might have imposed such an obligation, at least on the defendant, was ultimately abandoned.

■ Of course, if the State has been orally advised prior to trial of the reasons underlying an expert's conclusory, written report, which had been previously furnished to the defendant pursuant to MD.R. 741 b 4, the continuing duty of disclosure imposed by MD.R. 741 f would require that the additional information be promptly furnished to the defendant and the court notified that this has been done.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.